CBSJONEC                        Teleconference

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    -------------------------------x

 3    JENNIFER L. O'NEILL,

 4                    Plaintiff,

 5            v.                              11 Civ. 9128 PGG

 6    TERRY RICHARDSON,

 7                    Movant,

 8            v.

 9    MERMAID TOURING, INC., et al.,

10                    Defendants.

11    -------------------------------x

12                                        November 28, 2012
                                          5:00 p.m.
13
      Before:
14
                        HON. PAUL G. GARDEPHE,
15
                                          District Judge
16

17                            APPEARANCES

18

19    SNITOW KANFER HOLTZER & MILLUS LLP
            Attorneys for plaintiff
20    BY:  VIRGINIA KRISTINA TRUNKES, Esq.
                    Of counsel
21

22    PROSKAUER ROSE LLP (NY)
            Attorneys for defendants
23    BY:  STEVEN D. HURD, Esq.
            RACHEL FISCHER, Esq.
24                    Of counsel

25
```

CBSJONEC                    Teleconference

1          (Teleconference in chambers)

2          THE COURT:  This is Judge Gardephe.  Who do I have on

3  the line?

4          (Case called)

5          THE COURT:  As is probably obvious now, we have a

6  court reporter here so I would ask both sides to identify

7  themselves before they speak so we have an accurate record.

8          My notes indicate we have several items to discuss.

9  This was originally on for the 20th, and we had to adjourn it

10  for some reason I can no longer recall, but I know there is an

11  issue about what the plaintiff claims is a non-production of

12  certain e-mails by the defendants, and my sense from the

13  correspondence is that the underlying issue about

14  non-production has gone away, but that plaintiff is nonetheless

15  seeking sanctions against the defendants for some aspect

16  regarding the production of e-mails.

17          Ms. Trunkes, maybe you can enlighten me what it is

18  you're still seeking in connection with the e-mails?

19          MS. TRUNKES:  Sure, your Honor.

20          I guess you can say we gave up on trying to compel the

21  production of Ms. O'Neill's House of Gaga e-mails because after

22  what we described as being strung along for a while, and that

23  is important, the defendants finally elaborated a bit and said

24  look, because of the Google server, et cetera, this is all we

25  have and Ms. O'Neill's personal House of Gaga account has been

CBSJONEC                    Teleconference

1   destroyed on this date certain, et cetera, we don't have any

2   more.

3          At that point that's when we gave it a shot and tried

4   to do our own forensic analysis based on an old laptop Ms.

5   O'Neill had.  Yes, we did do that later on in time, but that

6   was only because we thought that these e-mails we were seeking

7   were readily accessible, and we still believe that they were

8   readily accessible, and that's really why we're seeking

9   sanctions because from the few e-mails that we were able to

10  recover from the forensic process, we found e-mails where, for

11  instance, there would be a string of e-mails between different

12  recipients and senders, and comparing that to what the

13  defendants had produced, there were instances where the

14  defendants produced, let's say, only the last item of the

15  string, but not all the items that preceded that.

16         It seems like that made us realize that, you know,

17  while these e-mails should have been readily accessible from

18  the defendants, it does seem like only bits and pieces were

19  given to us selectively, as what we did recover seemed far more

20  illuminating about the underlying issues than what we did

21  receive.

22         THE COURT:  Basically the defendants have said the

23  fact that you were able to forensically recover certain e-mails

24  from your client's laptop does not mean that they have access

25  to e-mails on their server.

CBSJONEC                    Teleconference

1          Their point is that the stuff was destroyed, and so I

2     guess what I need to hear from you at this point is some

3     evidence that although they say they don't have the e-mails any

4     more, that that's false.

5          MS. TRUNKES:  That is why I point to the example of a

6     string of e-mails.  So it is not explained how they would give

7     us the last e-mail from a string of e-mails but that the

8     beginning string of it would not be available.

9          I mean without having access exactly to what they

10    possess, it is harder for us to prove beyond that, but that

11    alone is an example of why wouldn't they have the earlier ones?

12    It is the end e-mail of, let's say, seven corresponding e-mails

13    back and forth.

14          THE COURT:  All right.  Mr. Hurd, do you have any

15    light to shed on that question?

16          MR. HURD:  I guess I have two points on that issue,

17    your Honor:  Number one, my only explanation for something that

18    they have that we wouldn't have is that Ms. Germanotta deleted

19    it and Ms. O'Neil did not.  Therefore, it is on Ms. O'Neill's

20    computer and not on Ms. Germanotta's computer.

21          From that standpoint, you know, we did produce

22    everything we had.  We didn't withhold something that was part

23    of a string and just produce the last e-mail and not all the

24    rest.  If we had the rest, we would have produced them.  Ginger

25    has provided us with 13 of the e-mails that she claims she

CBSJONEC                      Teleconference

1    discovered on this forensic search.  I don't know how many they

2    actually discovered, but she did provide us with 13 of those

3    e-mails.  I invite the court to review those 13 e-mails

4    because, quite frankly, none of them have anything to do with

5    anything that is particularly relevant with this case and they

6    certainly wouldn't be something that I would risk sanctions and

7    my legal license not producing.

8            They're really a whole bunch of nothing.  I don't

9    understand why we would be in some sort of position where we

10   would be trying to withhold these types of e-mails.  They're

11   really inconsequential e-mails.  Those others that she found

12   that are consequential, I am happy to review those, but there

13   really isn't anything that is of any real relevance to this

14   case.  Again, if we had them, if they were in the possession of

15   Ms. Germanotta, we produced them.

16           THE COURT:  Is there anything else you want to say on

17   the subject, Ms. Trunkes?

18           MS. TRUNKES:  Yes, that they are relevant and I guess

19   it is difficult to talk about this in the abstract.  We are

20   happy to supply what we found and explain its relevance and to

21   elaborate on this further with any technical descriptions of

22   how computers work, et cetera.

23           While I take Mr. Hurd's word for it that he produced

24   what he had and, you know, is saying any other e-mails were

25   deleted, in view of the technical analysis of this with a

CBSJONEC                          Teleconference

string of e-mails, for instance, that is very difficult to

believe because how could the beginning parts of an e-mail be

deleted when you still have the last one?  That is just an

example.

THE COURT:  All right.  Let me say, I do think it is

very difficult to deal with the issue in the abstract.  Right

now there is a motion pending for default judgment and other

sanctions.  I am denying that at this point, but that is

without prejudice to you, Ms. Trunkes, submitting a motion that

is more detailed in the sense that it identifies specific

documents that you believe the defendant only produced parts

of; for example, your point about the e-mail chain, where they

only produced the last e-mail and there is no explanation for

why the e-mails earlier in the chain were not produced.

I am making the ruling without prejudice to you

pursuing the matter, but it has got to be in a much more

specific way, attaching documents that you believe demonstrate

withholding of information and so forth.  Then I'll ask Mr.

Hurd to respond to it.  Then we'll have a concrete dispute that

I can actually deal with.  At this point, it's just too

amorphous.

MS. TRUNKES:  Right.

THE COURT:  What I would say to you, Ms. Trunkes, if

you believe you have such concrete evidence, then you're

welcome to make a motion seeking sanctions, and again just try

CBSJONEC                          Teleconference

1    to make it as concrete and as specific as you can.  To the

2    extent information about technical matters is necessary, put

3    that in there, and then Mr. Hurd will have an opportunity to

4    respond and address what you have raised and then I'll rule on

5    it.

6              MS. TRUNKES:  Okay.  Thank you, your Honor.

7              THE COURT:  The next issue I have before me relates to

8    a deposition preparation binder that was apparently reviewed by

9    Ms. Germanotta before her deposition.  The plaintiff has sought

10   production of the deposition binder, and the defendants have

11   opposed that.  Now, Mr. Hurd, I have a couple of questions for

12   you at the outset on this issue.  Does the binder contain

13   privileged material?

14             MR. HURD:  The actual documents themselves are not

15   privileged and we have produced all of them.

16             THE COURT:  Okay.  So then I turn to you, Ms. Trunkes.

17             I have a representation from Mr. Hurd that all the

18   documents in the deposition binder have been produced in

19   discovery.  So the next and obvious question is, why are you

20   entitled to know which documents Mr. Hurd decided it was

21   important for Ms. Germanotta to look at before her deposition?

22             MS. TRUNKES:  Because, your Honor, this is the very

23   rare case where the deponent explicitly testified that she was

24   fully prepared to give all her testimony after reviewing every

25   single page of what was provided to her and that by doing so,

1    that enables her to be able to give all this information

2    accurately, et cetera, and it is exactly that type of situation

3    which usually is more subtle, but it is exactly that situation

4    which then gives the adversary the right to test the deponent's

5    accuracy because then it becomes likely the information the

6    deponent relied on had subjective effect on that person's

7    testimony, and perhaps her testimony really wasn't credible or

8    that she wasn't recalling correctly because she was recalling

9    based on what she thought was important based on what was

10   compiled for her, and these were selected materials.

11          While, yes, we may have all those materials, we have a

12   whole lot of materials that were exchanged in discovery, but

13   apparently it is those materials that were the basis, form the

14   basis of her testimony, and this limited section of materials

15   is that much more important to test her credibility.

16          The defendants don't truly argue that the binder and,

17   as Mr. Hurd just said, the information was not privileged,

18   there are no notes directly to the client, et cetera, and even

19   if there was some work product, that alone is not dispositive

20   given the balance of interests at stake.  If ever there were a

21   case where a deponent's testimony were now questionable, I

22   think it would be this.

23          THE COURT:  Mr. Hurd, do you want to respond?

24          MR. HURD:  Well, at least in the letter to your Honor,

25   the only testimony that plaintiff seeks that Ms. Germanotta

CBSJONEC                    Teleconference

said she read cover-to-cover is the deposition of Ms. O'Neill,

which is understandable.  She never testified that her

testimony was based on any review of anything, and the quotes

that plaintiff's counsel provides don't say that.  That is not

what she said.

Since all of the documents in the binder were

produced, the only basis that plaintiff could possibly have for

seeking the binder itself is to determine what documents we

have.  All the documents that were produced.  We, as her

counsel, we determined what was particularly important; and,

therefore, those are privileged and we obviously provided the

case law to that effect.  There is no other reason for her to

have that information because she already has the documents.

So we would argue that it is privileged and would object to its

production.

MS. TRUNKES:  If I can just add that we didn't cite

the different documents, but we cited the pages of the

transcript which I understand, your Honor, you don't have.  Ms.

Germanotta identified several documents, not only Ms. O'Neill's

deposition transcript.  There were several different items, and

obviously we would elaborate if there are more formal motion

practice.

MR. HURD:  If I can just respond.

We didn't object to the questions at the deposition,

and Mr. Millus was free to explore that issue as far as he

CBSJONEC                        Teleconference

1    wanted to, but then to call for the production of the binder

2    when it obviously is ordered and selected by counsel goes

3    beyond what they're entitled to.

4            MS. TRUNKES:  Except that the law does allow the

5    adversary to inspect and review what the witness relied upon.

6            MR. HURD:  Which they have.

7            THE COURT:  I don't disagree with you, Ms. Trunkes,

8    that the lawyer taking the deposition is entitled to have the

9    documents that a witness reviewed, but Mr. Hurd has represented

10   that all the documents were produced in discovery, so you have

11   them or your colleague had him, whoever took the deposition.

12           Then what we're left with is are you entitled to know

13   what Mr. Hurd thought was relevant because essentially that's

14   what we're talking about here.  Mr. Hurd put together, as I

15   understand it, Mr. Hurd put together a binder of documents that

16   he considered important for his client to review, and what I am

17   struggling with here is it is hard for me to see how I can

18   order the production of those documents without simultaneously

19   causing Mr. Hurd, Mr. Hurd's evaluation of what is important in

20   the case, for that not to be disclosed as well because that is

21   essentially what we are talking about here.

22           MS. TRUNKES:  Well, the cases that both of the parties

23   rely upon discussed the order of the documents, and that would

24   settle on an attorney's thinking.  We are not asking them for

25   any particular order.  We are not looking to find out the

1    attorney's thinking, but under the clear law when a witness's

2    recollection of events is relevant, that's where we're asking

3    to see well, then, what was the limited selection which

4    suddenly gave a refreshment to Ms. Germanotta's memory she was

5    so thoroughly prepared for her deposition.

6              MR. HURD:  Your Honor, if I could respond to that.

7              There was no testimony from Ms. Germanotta that the

8    binder in any way refreshed her recollection, and the quotes

9    that plaintiff's counsel has provided in the joint letter

10   doesn't say anything about Ms. Germanotta saying that the

11   binder and the binder alone or the binder in combination with

12   anything else refreshed her recollection about the facts in

13   this case and what her testimony would be.  She merely said she

14   reviewed the binder, and we admit that she reviewed the binder

15   as we do with anybody that we are preparing for testimony, and

16   so that is not the issue.

17             With respect to not even the order, it is as you

18   already said, the selection of the thousands of pages of

19   documents that have already been produced by both sides, the

20   selection by counsel of which documents we thought were

21   relevant to the plaintiff in her review before her deposition.

22             THE COURT:  Let me say, I've looked at Federal Rule of

23   Evidence 612 (a), which is entitled, "Writing used to refresh a

24   witness's memory," and (a) addresses scope, and the rule

25   states:

CBSJONEC                        Teleconference

1        "This rule gives an adverse party certain options when

2   a witness uses a writing to refresh memory:  One, while

3   testifying; or, two, before testifying, if the court decides

4   that justice requires the party to have those options."

5        So I am confronted with a situation where counsel has

6   represented that all of the documents contained in the

7   deposition binder were produced in discovery so, therefore,

8   they were available to plaintiff's counsel when the deposition

9   was taken, and so what I am left with is that the primary

10  purpose, I think, underlying this application is that

11  plaintiff's counsel wants to learn what defense counsel thought

12  were the most critical documents here.

13        I might say at the outset, a representation has been

14  made that Ms. Germanotta did not say that her memory had been

15  refreshed by the documents, but whether or not she said that,

16  this isn't going to come up at trial, assuming there is a trial

17  in this matter, I am not going to venture down the road of

18  whether someone else's memory was good at the deposition or was

19  not good at the deposition or was refreshed by documents

20  particularly where apparently their memory was not refreshed in

21  the way it ordinarily happens or someone says I have a failure

22  of recollection, and then they're shown a document and their

23  memory is thereby refreshed.

24        What I am left with is a concern that, as I've

25  indicated, producing the binder would reveal defense counsel's

CBSJONEC                        Teleconference

1   evaluation of what the most significant documents are in the

2   case, and on that point there is law that has been cited by

3   defense counsel indicating that the selection of documents that

4   a lawyer puts together can reveal work product information

5   because it does tend to communicate what the lawyer believes

6   are the most significant documents in the case.

7           For that proposition, I am relying on several of the

8   cases cited by defense counsel in the October 12, 2012 letter,

9   including Spork versus Pell, 759 F.2d 312, at 316 (3d Cir.

10  1985), as well as the Second Circuit's decision in in re: Grand

11  Jury Subpoenas, 959 F.2d 1158, at 1166.  That is my ruling with

12  respect to the deposition binder issue.

13          The next issue is defendant's request to maintain as

14  confidential certain documents attached to defendant's motion

15  to quash a non-party subpoena directed against a man named, I

16  take it a man, Terry Richardson.

17          MS. TRUNKES:  Yes.

18          MR. HURD:  Yes.

19          THE COURT:  Mr. Richardson, as I understand it, is a

20  photographer.  He was hired by one of the defendants to take

21  photographs while that defendant was on tour.  There is a

22  dispute ongoing between the parties in this action about

23  whether plaintiff is entitled to those photographs.

24          This is a case about compensation that the plaintiff

25  argues she is entitled to, and I gather from prior conferences

CBSJONEC                        Teleconference

1    with the parties that the argument is that there may be

2    photographs that show the plaintiff with the defendant; and,

3    therefore, it tends to support her arguments about her hours

4    and employment responsibilities with the defendant.  So that's

5    the backdrop.

6         There is a request now to maintain as confidential

7    certain documents.  The parties have, I guess, designated them

8    as confidential pursuant to the protective order, so does that

9    lay the groundwork, Mr. Hurd, adequately?

10        MR. HURD:  Yes, your Honor, it does.

11        THE COURT:  All right.  So you want to lay out for me

12   just briefly what the basis is for the application to maintain

13   these documents?  I gather you want them -- do you want them

14   maintained under seal?  Is that your application?

15        MR. HURD:  Yes, your Honor, these are documents that

16   were attached either to our motion to quash or plaintiff's

17   counsel's opposition to our motion to quash the subpoena

18   related to Mr. Richardson's photographs, and they fall into

19   four categories:

20        One is testimony, deposition testimony from Ms.

21   Germanotta;

22        One is deposition testimony from a Wendy Morris, who

23   is a third-party witness;

24        One is e-mails between Ms. Germanotta and Ms. O'Neill,

25   or other e-mails regarding Ms. Germanotta's business; and

CBSJONEC                    Teleconference

1          The fourth is the responses that we provided to

2     plaintiff's request to admit during the discovery period.

3          With respect to Ms. Gaga's testimony, it was all

4     designated as confidential pursuant to the court reporter who

5     was selected by plaintiff's counsel, and then we informed

6     plaintiff's counsel under the stipulation and order of

7     confidentiality that we considered the pages that they have

8     cited to be confidential, and I would note that Mr. Millus

9     promised to Ms. Germanotta on the record that the testimony

10    that she was giving was going to be considered confidential,

11    and for some reason now they want that testimony to be

12    disclosed, and it is our position that it should be

13    confidential.  It deals with Ms. Germanotta's business, and

14    obviously she is a high-profile individual.

15         With respect to Ms. Morris' testimony, she is a third

16    party that has nothing to do with this but has information

17    related to it.  We have designated this as confidential.  It

18    deals with Ms. Germanotta's business and her tours and things

19    like that.

20         With respect to the e-mails, again they relate to Ms.

21    Germanotta's business, and also to reveal them would also

22    breach a separate confidentiality agreement that Ms. O'Neil

23    signed when she started working for Ms. Germanotta back in

24    2010.

25         Finally, with respect to our answers to requests to

1   admit, those are are pleadings between the parties that have no

2   reason to be disclosed at all, and most importantly certainly

3   none of the requests to be made other than the one that

4   plaintiff has identified as relevant to this case should have

5   to be revealed.  There is no reason for all of those responses

6   for requests to admit be revealed.

7        Given the history of the case and the court's order

8   the case not be tried in the press, we see no reason why these

9   should not be filed under seal especially given the high

10  profile of the individual we are dealing with.  I can think of

11  no reason why plaintiff would object to that other than they

12  want to try this case in the press.  That is our position on

13  that with respect to those documents.

14       THE COURT:  All right.  Just I want to identify

15  specifically what the documents are that are in dispute.  As I

16  understand it, they are Exhibits A through H that are attached

17  to plaintiff's declaration in opposition to the motion to

18  quash.  Are those the exhibits that are in dispute?

19       MR. HURD:  Yes, your Honor, with the exception of

20  Exhibit F, which is simply your order of confidentiality.  I

21  don't think there is any reason to keep that confidential.

22       THE COURT:  Okay.  Now, I will examine all of these

23  exhibits and make a determination.  I will tell you, Mr. Hurd,

24  that in doing so, I am going to be guided by the Second

25  Circuit's decision in Lugash versus Pyramid Company of

CBSJONEC                    Teleconference

1    Onondaga, 435 F.3d 110 (2d Cir. 2006), and as I am sure you

2    know, that sets a high standard for sealing.  It requires me to

3    make specific on-the-record findings that sealing is essential

4    to preserve higher values and is narrowly taylored to serve

5    that interest.

6          I suspect, based on what you've told me, that you're

7    relying on the notion that private information or business

8    information that could be harmful if disclosed, that's in

9    general the basis for your application.  Am I right?

10         MR. HURD:  Well, I would add to that at least with

11   respect to Ms. Germanotta's testimony and our responses to the

12   request to admit, number one, an assurance from plaintiff's

13   counsel during the deposition to my client he would not

14   disclose the information she was testifying to, it would be

15   kept confidential, I think that is relevant in your evaluation.

16         With respect to the requests to admit, I argue

17   relevance.  I truly believe plaintiff's counsel is providing

18   attaching documents not relevant to the particular issue at

19   hand simply to get them out there and get them ECF filed.  The

20   entire responses to 11 or 12 requests to admit, with only one

21   request to admit is relevant to this motion, the motion to

22   quash, seems to be completely inappropriate, and so I would

23   also argue relevance.

24         I know that is not a term under the case you cite, but

25   it is a term with respect to any motion that parties make, that

1   they should only be including relevant information.

2          THE COURT:  All right.  Ms. Trunkes, is there anything

3   you want to say on this subject before I move on?

4          I am not going to decide the issue on today's call.  I

5   need to rereview the documents individually.  As I said, I'll

6   determine how the Lugash case applies.  Anything you want to

7   say before we move on?

8          MS. TRUNKES:  Yes, your Honor.  Thank you.  I have a

9   couple of comments.

10          With respect to the responses to plaintiff's request

11   to admit, it never occurred to us to limit just to one page

12   that exhibit.  Usually it is my practice to attach the entire

13   document response and deposition testimony usually unless it is

14   very large in this case.  With respect to the deposition

15   exhibits, we attached a total of four pages or so, a handful of

16   pages, and they were all very relevant for exactly the points

17   we were making.

18          I wouldn't characterize Mr. Millus' statement as a

19   promise or assurance with respect to the entire testimony.

20   That was at a particular point, the deponent Ms. Germanotta

21   expressed tentativeness about saying something she wanted to

22   say.  He encouraged her to say it.  If there was something

23   confidential, or what your order says, personal information, we

24   would certainly agree that should remain under seal.  We are

25   not trying to embarrass anybody.

1          Finally, of course, we disagree with the proposition

2     that just because we oppose sealing everything the defendant

3     says, we must want to have this information in the press.  That

4     is not the equivalent.  That is not our reason.  It is

5     following the same standard which your Honor pointed out which

6     is in the confidentiality order the Lugash case.

7          THE COURT:  Just so I know, what is the relevant

8     admission or response to request to admit, because it sounds

9     like there are a number of requests that were made but not all

10    of them are relevant.  What should I be focused on?

11         MR. HURD:  Request No. 11, Request to Admit No. 11 is

12    the one that plaintiff's counsel -- and, Ginger, correct me if

13    I am wrong -- is relying on, and there are I think 12 requests

14    to admit in the entire document.

15         THE COURT:  All right.  As I said, I will deal with

16    this separately after I've had an opportunity to review each

17    document.

18         Then we have defendant's motion to quash the non-party

19    subpoena to Mr. Richardson that I mentioned a moment ago, and

20    the defendants have offered essentially three arguments why the

21    subpoena should be quashed, and just for the record again, the

22    issue is certain photographs that Mr. Richardson took while on

23    tour.  The defendants argue that the subpoena is overbroad,

24    that it seeks documents that are relevant to the litigation and

25    that the subpoena is harassment under the circumstances.

1      So let me start with the over-breadth point, and I

2  think the issue is that the request seeks all images that were

3  captured by Mr. Richardson during the tour, which I gather took

4  place over a 13-month period.  I think we've sort of been down

5  this road before because I remember someone saying that it was

6  impossible to isolate images of Ms. Germanotta and plaintiff

7  from other photographs that Mr. Richardson may have taken on

8  the tour.  So if I am right about that, how can I find that the

9  subpoena is overbroad?

10      The alternative, Mr. Hurd, is that Mr. Richardson be

11  forced to go through all the images, and I understand there are

12  a lot of them, and spend his time bulk-plucking out the ones

13  that show Ms. Germanotta with the plaintiff.  So that's the

14  state of play.

15      I think the representation was made Mr. Richardson

16  didn't want to take his time to go through through all the

17  images and pluck out the ones that showed Ms. Germanotta with

18  the plaintiff.  So that being the case, what's the alternative

19  to the production of the entire take?

20      MR. HURD:  Well, your Honor, the other argument that

21  we have presented is that regardless of whether Mr. Richardson

22  does it or we produce the whole thing and Ms. O'Neill's counsel

23  does it, it is not going to prove anything.  So it is going to

24  be an exercise in futility because the fact that Ms. O'Neil

25  happened to be somewhere at a certain time when a picture was

1    taken does not demonstrate what she was doing before that

2    picture immediately, or immediately after that picture was

3    taken and certainly doesn't demonstrate she worked a certain

4    number of hours in a particular day or anything that would be

5    relevant to this case.

6          There is no dispute Ms. O'Neil was with Ms. Germanotta

7    on those tour dates, and so if that is what it proves, it

8    certainly doesn't have any relevance to this case.  A snapshot

9    in time where she happened to be somewhere does not establish

10   anything relevant to this case, and so essentially what their

11   subpoena is requesting is that Mr. Richardson either produce a

12   whole host of photographs that are his proprietary information

13   in order for plaintiff to review all of those pictures, most of

14   which are going to have nothing to do with this case and

15   nothing to do with Ms. O'Neil.

16         Even those that do picture Ms. O'Neil are not going to

17   have anything to do with establishing what her relations are in

18   this case.  Therefore, our position is that whether

19   Mr. Richardson is forced to do it and go through and find all

20   the pictures with Ms. O'Neil, or plaintiff's counsel does, it

21   doesn't advance anything.  It is not going to be something that

22   is relevant discovery that will advance her case in any way.

23         There is not a dispute in this case, by the way, of

24   any particular day or particular concert or particular

25   situation that Ms. O'Neil didn't attend other than whether or

1   not she was at behind the scenes, off stage directing Ms.

2   Germanotta during the concerts, and a picture demonstrating

3   that in one or two instances is certainly not going to

4   establish she was there on a regular basis that would establish

5   their claim.

6           All of these photographs really aren't going to

7   provide anything, and we are talking about a third-party

8   individual who has nothing to do with this case who would have

9   either engaged in hours and hours and weeks and weeks of work

10  in order to review them or turn over proprietary information

11  for something that is really not going to advance this case in

12  any way.

13          THE COURT:  So how are the photographs relevant, Ms.

14  Trunkes?

15          MS. TRUNKES:  Your Honor, the photographs are entirely

16  relevant.  What Mr. Hurd described, it goes to the weight and

17  not to the relevance of the photographs.  First of all, the

18  defendants don't even account for what if there are some

19  pictures that --

20          THE COURT:  Let me repeat the question.  I had a very

21  specific question.  Tell me the relevance of photographs

22  showing Ms. Germanotta with your client, tell me what the

23  relevance of those photographs are to your case.  That is my

24  question.

25          MS. TRUNKES:  To show her working or what hours of the

1    day she was working or on call or nearby.  Some of the photos

2    of her may not assist Ms. Germanotta, even if not likely, but

3    they will show her there and some may show her in the

4    quick-change, which is the behind scenes change.  Some show her

5    physically assisting her with that.  That is not something she

6    would be standing around as a friend versus working.  If she is

7    standing around holding coffee and water next to Ms.

8    Germanotta, she is likely working.

9         If she is sitting and talking with Ms. Germanotta

10   somewhere, it is up to the parties and their credibility and

11   for the fact-finder to determine whether she was working or

12   whether they were just sitting there as friends.  There is

13   going to be a large dispute about that throughout this case,

14   but the e-mails do not tell the entire story.

15        The photos are relevant because the photos will fill

16   in the gaps of time when there aren't e-mails because if the

17   parties were right next to each other, they would not be

18   e-mailing to each other.  Therefore, they're relevant.

19   Photographs are highly detailed, objective evidence and it

20   shows something that is missing here.

21        More importantly, the defendants have not sustained

22   their burden.  It is their burden to show undue hardship

23   because Mr. Richardson does not address how the photos are

24   stored.  He doesn't address what efforts would have to be

25   undertaken in order to just produce those photos, just copy

CBSJONEC                        Teleconference

 1   them onto a flash-drive and give them to us if he doesn't want

 2   to use the iPhone technology to narrow them down.

 3          This is a burden placed on the defendants, and they're

 4   not meeting it and it is fully objective evidence that the

 5   parties and the fact-finder should have to determine the facts

 6   in this case about to what extent Ms. O'Neil worked and was

 7   entitled to overtime.

 8          THE COURT:  Let me ask you this, Mr. Hurd:  Are the

 9   photographs captioned?

10          Does Mr. Richardson have records indicating when each

11   photograph was taken and where?

12          MR. HURD:  Well, "where" I think he could probably

13   determine from looking at them.  When and in particular the

14   time of day, they are not.

15          THE COURT:  But there is information that would

16   indicate the date a particular photograph was taken?

17          MR. HURD:  I don't know if Mr. Richardson could do

18   that by looking at them, just by his recollection, but there is

19   nothing on the photographs, either behind the photograph or on

20   the photograph itself, that has a date and time stamp.

21          MS. TRUNKES:  Digital photos have that inherent with

22   them.  If you click on it in digital fashion, you will find the

23   date.

24          MR. HURD:  Mr. Richardson is a professional

25   photographer, and the pictures are not necessarily -- I don't

CBSJONEC                          Teleconference

 1   want to say none of them are, but they're not necessarily

 2   digital photographs.

 3          THE COURT:  I am ready to rule on the issue.

 4          At this point it does seem to me, given the broad test

 5   that applies to pretrial discovery, that photographs showing

 6   the plaintiff with Ms. Germanotta on tour and perhaps

 7   performing work tasks could be relevant to plaintiff's claims.

 8   I certainly can't make a finding at this point that they are

 9   not.  I do accept the proposition that a photograph can often

10   be much more compelling evidence than, say, an e-mail that

11   describes in black and white an event.  So that is just a fact.

12          Sometimes a photograph, a visual presentation of an

13   event is much more powerful than either the testimony about the

14   matter from the witness or even documentary evidence.  So in

15   deciding how to rule on that, I have to be aware of that.

16          Now, with respect to the burden issue, I find that

17   Mr. Richardson just hasn't demonstrated to me that there is any

18   significant burden in producing the photographs.  They will be

19   produced in electronic form.  The only argument that has been

20   made is that it would be very burdensome for him to have to go

21   through these photographs and select out the ones that depict

22   the plaintiff and Ms. Germanotta, and I accept that, given the

23   number of photographs, that would be a burden.

24          It seems to me the choice is for him to make, whether

25   he wants to to take the time to go through the photographs

CBSJONEC                    Teleconference

1   themselves and produce only those that show the plaintiff and

2   Ms. Germanotta, he's free to do that.  If he doesn't want to

3   take up his time doing that search, then he will produce all

4   the photographs.  They will be subject to the protective order

5   in the case, so there won't be any disclosure of the

6   photographs outside of the purposes of this case.  Presumably

7   they'll be returned to Mr. Richardson upon the close of the

8   litigation, so I don't see any harm to him in terms of

9   commercial exploitation of the photographs.

10          I leave up to him whether he wants to take the time to

11  produce only the documents or only the photographs that depict

12  the plaintiff and Ms. Germanotta to you or whether he would

13  rather not go through that exercise and instead turn over a

14  disc that contains all the photographs; and, therefore, require

15  plaintiff's counsel to spend their time going through the take

16  to figure out where the photographs are that show the plaintiff

17  with Ms. Germanotta.  So that is my ruling on the motion to

18  quash.

19          MR. HURD:  Your Honor, could I get some clarification

20  on that?

21          THE COURT:  Sure.

22          MR. HURD:  I guess two issues:  One, if we were to

23  choose to have Mr. Richardson review the photographs himself,

24  what would be the timing as far as producing those photographs?

25          THE COURT:  Well, I don't at this point have a great

CBSJONEC                      Teleconference

1    handle on how burdensome that would be.  The representation has

2    been made there are thousands of photographs at issue taken

3    over a 13-month period, and so my sense at this point is that

4    it would be burdensome to go through all of the photographs and

5    pluck out the ones that show the plaintiff with Ms. Germanotta,

6    and I assume that that would take some time.

7                 I am not really in a position at this point to make a

8    determination of how long it should take.  You'd probably be in

9    a better position than me at this point to know how long would

10   be a reasonable time to perform that exercise if that's the way

11   Mr. Richardson prefers to proceed.

12               MR. HURD:  Thank you.

13               MS. TRUNKES:  May I make a suggestion?  Is it --

14               THE COURT:  Sure.

15               MS. TRUNKES:  -- is it possible to consider the

16   parties finding an independent forensic photography person to

17   do that on his or her own so that we'll get a better concrete

18   time, more of a motivation incentive to do it within a

19   reasonable period of time and also a greater assurance of the

20   integrity of the process which, unfortunately, will be a

21   concern for plaintiff?

22               MR. HURD:  Your Honor, first of all, that obviously

23   raises the same proprietary information issues that we have

24   with our motion to quash, which is that Mr. Richardson does not

25   want his proprietary photographs being disclosed to others.

1    In addition, there has been no argument that Mr. Richardson

2    doesn't know what Ms. O'Neil looks like.  I don't know that

3    anybody else would be in a better position in determining

4    whether Mr. O'Neill is or is not --

5              THE COURT:  I am not going to hire Mr. Richardson or a

6    third party to go through the photographs, the take to make

7    sure he is producing what he has been ordered to produce.  That

8    is just not the way our system works.  The courts issue orders

9    that certain materials are to be produced, and the parties have

10   that obligation.  We don't hire third parties to make sure that

11   they're actually going to do what a court has ordered them to

12   do.  If they don't do what they're told to do, there are

13   obviously sanctions, including contempt sanctions that can be

14   imposed where there was an intentional decision made to disobey

15   a court order.  I am not going to require the defendants or

16   Mr. Richardson to pay for a third party to do this, to do this

17   search and selection.

18             Now, as to time period, Mr. Hurd, do you have a sense

19   of how long it would take to do this?

20             I am not going to give you a long time, so why don't

21   we start with that.  I want this matter resolved quickly.

22   We're at the end.  We are past the discovery deadline at this

23   point, so I don't want this to delay the case.

24             MR. HURD:  I appreciate that, your Honor, and that was

25   why I asked the question because I don't know what

1    Mr. Richardson's schedule is.  He has represented it would take

2    him a couple of weeks straight time in order to review them

3    all, and I don't know what his schedule is particularly given

4    the fact the holidays are coming up.

5         I would request at least a month for him to do so,

6    which actually leads me to my other question on your order,

7    which is if we were to elect -- if it is too burdensome for him

8    to do the whole thing -- elect to provide plaintiff's counsel

9    with all of the photographs, and again we haven't made a

10   decision on that, having just gotten your order, but if we to

11   do that, I appreciate your Honor said they would have to return

12   the photographs that don't depict Ms. O'Neil after the case,

13   but my question is whether any photographs other than those

14   that depict Ms. O'Neil would be fair game for them to be used

15   in this case?

16        THE COURT:  Well, I think -- and you correct me if I

17   am wrong, counsel -- that the request was made going back, as I

18   understand it, for photographs that showed Ms. Germanotta with

19   the plaintiff during the period of this 13-month tour.  Was

20   your request broader than that, Ms. Trunkes?

21        MS. TRUNKES:  Yes, it was broader than that, although

22   it wasn't as broad as to include other people not connected

23   with Ms. Germanotta and her tour.  We didn't want to

24   unnecessarily narrow it to just pictures of Ms. O'Neil if

25   perhaps there were some relevant photos that did not contain

CBSJONEC                        Teleconference

 1  Ms. O'Neil.  It is difficult for me to articulate why they

 2  might be relevant without having them and seeing them, and I

 3  wasn't on the tour so I wouldn't know, but it is true that our

 4  request was broader than just asking for Ms. O'Neill's

 5  pictures.

 6          THE COURT:  My ruling, just to be clear, it is limited

 7  to photographs that show the plaintiff with Ms. Germanotta.  It

 8  doesn't extend to other staff working for Ms. Germanotta.  It

 9  doesn't extend to pictures of Ms. Germanotta alone.  The only

10  relevance that's been explained to me of the photographs is

11  photographs that might shed light on the plaintiff's work

12  responsibilities for Ms. Germanotta.  So I don't see how photos

13  of others or photographs of Ms. Germanotta alone would be

14  pertinent.

15          So if, Mr. Hurd, Mr. Richardson decides to go down the

16  road of plucking out the photographs as opposed to producing

17  his entire take, you should understand that the ruling that I

18  have made is that photographs that show Ms. Germanotta and the

19  plaintiff together, those are the photographs that he's

20  required to produce.

21          MR. HURD:  And if we produce all of the photographs

22  just to save time, the only ones that plaintiff can use in this

23  case would be those pictures involving Ms. O'Neill and Ms.

24  Germanotta?

25          THE COURT:  Is there anything you want to say before I

CBSJONEC                        Teleconference

1    rule on that subject, Ms. Trunkes?

2            MS. TRUNKES:  I think consistent with your ruling,

3    that's fine.  I do wonder if there is any pictures of just Ms.

4    O'Neill.  I am sure there isn't, but if we can include that as

5    a possibility?

6            THE COURT:  I am not going to allow this to turn into

7    a fishing expedition.  There has been a certain basis, certain

8    argument that has been made how these photographs are relevant.

9    I have accepted the argument, but I am not going to allow that

10   to be used as a wedge to get, to conduct a fishing expedition

11   more broadly into all the photographs.

12           So the ruling is limited to photographs that show Ms.

13   Germanotta and the plaintiff.  It will not expand beyond that.

14   So to answer your question, Mr. Hurd, if the decision is made

15   to produce all the photographs, plaintiff's use of those

16   photographs will be limited to photographs that show Ms.

17   Germanotta and the plaintiff.

18           Now what I am going to require you to do, Mr. Hurd, I

19   am going to give you a date certain by which time you're going

20   to make the decision about how you're going to proceed because

21   if the decision is made to turn over the entire take, there is

22   no reason why that shouldn't happen right away.

23           MR. HURD:  I don't disagree with that.

24           THE COURT:  How about by Monday you'll notify myself

25   and counsel, plaintiff's counsel, how you're going to proceed?

1          MR. HURD:  Your Honor, I am going to be going on

2    vacation tomorrow, and I don't know if I will be able to speak

3    with my client before then.  I ask if I can have until

4    Wednesday?

5          THE COURT:  Okay.  That is a week from today?

6          MR. HURD:  Right.

7          THE COURT:  You will tell us a week from today how

8    you're going to proceed.  If the decision is made you will just

9    turn over the entire take, you will do that very promptly after

10   a week from Wednesday, i.e., within a day or two.

11         If your decision is that Mr. Richardson is going to go

12   through these photographs and pluck out the ones that show the

13   plaintiff with Ms. Germanotta, what you've asked for is a month

14   to allow him to do that.  Ms. Trunkes, do you object to that?

15         MS. TRUNKES:  No.  A month is reasonable.

16         THE COURT:  If that's the course that is decided upon,

17   Mr. Richardson will have a month from that point.  Why don't

18   we, for ease of reference, just have it run a week from today?

19   I don't have a calendar in front of me.  The 30 days will run a

20   week from today if that is the course that is decided on.

21         Now, are there any other issues that we should talk

22   about?

23         MS. TRUNKES:  I think just time deadlines for motions.

24         So there is a partial summary judgment motion that

25   defendants plan to make, and then also your Honor had given the

CBSJONEC                    Teleconference

 1  plaintiff leave to make the motion regarding the e-mails.  If

 2  we can just go over the dates?

 3          THE COURT:  All right.  Why don't we start with the

 4  summary judgment.  So I have a dim recollection, Mr. Hurd, you

 5  want to move for partial summary judgment, but I must tell you

 6  I don't remember, I don't remember the basis or the claim that

 7  you wish to move on.  Could you refresh my memory?

 8          MR. HURD:  There are several bases, but the main

 9  thrust of it is how damages, if plaintiff was entitled to

10  damages, how they would be calculated, as we believe a decision

11  on that issue would advance settlement discussions.

12          THE COURT:  Well, I guess the question is now that

13  we're at the end of discovery, why does it make sense for me to

14  hear a partial summary judgment motion at this point?  Why

15  shouldn't it be a summary judgment motion on any matter that

16  you think is deserving of summary judgment?

17          MR. HURD:  Well, I don't have any objection to that,

18  but when we were in court the last time, your Honor, you asked

19  if I would be making another motion, summary judgment motion

20  other than this one, and I represented to the court I wouldn't

21  be, and my position hasn't changed.

22          THE COURT:  Okay.

23          MR. HURD:  It doesn't matter to me how we want to

24  characterize it, that is how we intend to move on, in

25  substance.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  That is fine.  I am just going to set a

2    date for summary judgment.  It will be in whatever form you

3    want to bring it.  I understand it will be a motion for partial

4    summary judgment; so, in other words, it will be a motion that

5    is directed only to some issues in the case.

6          Now, does the plaintiff intend to move for summary

7    judgment?

8          MS. TRUNKES:  No.

9          THE COURT:  All right.  So we have this issue

10   outstanding about the photographs and we have set a schedule

11   for that.  Then we have the issue about the non-production of

12   the e-mail.  So what I want to do at this point is set a

13   schedule for the filing of summary judgment, and I am

14   thinking --

15         MS. TRUNKES:  Can I mention, your Honor, there had

16   been a schedule already in place, but the due date for the

17   defendant's motion I think was November 2nd, and that was

18   during the hurricane, the storm.  So I don't know if they need

19   the full amount of time normally allotted since there has been

20   time.  I just wanted to opine that, your Honor.

21         MR. HURD:  Well, I don't think any of your decisions

22   here today, your Honor, impact our motion.  We were going to

23   suggest we could get our portion, our initial moving papers

24   into the court by a week from Friday, which would be December

25   7th.

CBSJONEC                    Teleconference

1          THE COURT:  All right.  30 days for you to respond,

2    Ms. Trunkes?

3          MS. TRUNKES:  Yes, that would be fine, yes.

4          THE COURT:  And a week to reply, Mr. Hurd?

5          MR. HURD:  Can we get two weeks to reply, your Honor?

6    I would expect the reply will be trickier than the moving

7    papers.

8          THE COURT:  All right.  The 21st is actually a federal

9    holiday.  It is Martin Luther King Day, so it will be the 22nd.

10         MR. HURD:  Thank you.

11         THE COURT:  All right.  Now, with respect to your

12   anticipated motion, Ms. Trunkes, about the e-mail, what is your

13   pleasure?

14         MS. TRUNKES:  I guess I would ask, I would ask until

15   the 14th, and only because I think we would need to get a

16   declaration from a computer expert, and I can't say that I have

17   that all lined up right now, but I would want to include that.

18         THE COURT:  All right.  How long will you need to

19   respond to that, Mr. Hurd?

20         MR. HURD:  Well, given the holidays and our summary

21   judgment motion, I'd ask for a month.

22         THE COURT:  All right.  How long do you want to reply,

23   Ms. Trunkes?

24         MS. TRUNKES:  Two weeks.

25         THE COURT:  All right.  All right.  So we will issue

CBSJONEC                      Teleconference

```
 1    an order with all these dates.  When I say "all these dates," I

 2    mean the dates for the summary judgment motion, the dates for

 3    the sanctions motion on the e-mail.  I will attempt to resolve

 4    the outstanding issue about sealing.

 5              Anything else?

 6              MR. HURD:  Not from me, your Honor.

 7              MS. TRUNKES:  I think that is it, your Honor.

 8              THE COURT:  I wish you both a very good night.

 9              (Court adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```