UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JENNIFER L. O'NEILL,                                                :

                          Plaintiff,        :        Case No. 11-Civ-9128 (PGG)

             -against-                                  :        ECF

MERMAID TOURING INC. AND                              :
STEFANI JOANNE GERMANOTTA,
a/k/a "LADY GAGA,"                                                :

                    Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF JENNIFER L. O'NEILL'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

SNITOW KANFER & HOLTZER, LLP
575 Lexington Avenue, 14th Floor
New York, New York 10022
(212) 317-8500

*Attorneys for Jennifer L. O'Neill*

Of Counsel: Virginia K. Trunkes

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    DEFENDANTS ARE NOT ENTITLED TO PARTIAL
    SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    The Fluctuating Workweek Method is Not Applicable . . . . . . . . . . . . . . . . . . . . 7

        1.    Implementation of a Fluctuating Work Week
            Method of Calculating Overtime Compensation . . . . . . . . . . . . . 7

        2.    The Bulletin's Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        3.    Applying the FWW Method in an Overtime
            Misclassification Case Would Eviscerate the FLSA . . . . . . . . . 14

        4.    The FWW Method is Inapplicable in This Case . . . . . . . . . . . . 17

    C.    The New York State Labor Law Governs Ms. O'Neill's
        State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    D.    Ms. O'Neill's "On Call" Time is Compensable as a Matter of Law . . . . . . . . . 21

    E.    Ms. O'Neill's Spread of Hours Claim is Withdrawn . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**Page(s)**

*Adams v. Department of Juvenile Justice of City of New York,*
    1996 WL 82404, *2 (S.D.N.Y. 1996) ......................................... 3

*Armour & Co. v. Wantock,*
    323 U.S. 126, 65 S.Ct. 165 (1944) ..................................... 21, 24

*Ayers v. SGS Control Services, Inc.,*
    2007 WL 646326, *12 (S.D.N.Y. 2007) ................................... 11

*Blackmon v. Brookshire Grocery Co.,*
    835 F.2d 1135 (5th Cir.1988) ............................................. 16

*Blotzer v. L-3 Communications Corp.,*
    2012 WL 6086931, *10 (D. Ariz. 2012) ..................... 10, 11, 14, 15, 16

*Brooklyn Sav. Bank v. O'Neil,*
    324 U.S. 697, 65 S.Ct. 895 (1945) ......................................... 3

*Condo v. Sysco Corp.,*
    1 F.3d 599 (7th Cir. 1993) ................................................. 9

*Desmond v. PNGI Charles Town Gaming, L.L.C.,*
    630 F.3d 351 (4th Cir. 2011) ........................................... 13,14

*Dingwall v. Friedman Fisher Associates, P.C.,*
    3 F.Supp.2d 215 (N.D.N.Y. 1998) ........................................ 8

*Hammell v. Banque Paribas,*
    90-cv-4799, 1993 WL 426844 (S.D.N.Y. 1993) ........................... 20

*Hart v. Dresdner Kleinwort Wasserstein Sec., LLC,*
    2006 WL 2356157 (S.D.N.Y. 2006) ................................... 19, 20

*Hasan v. GPM Investments, LLC,* -
    -- F.Supp.2d ----, 2012 WL 3725693, *3 (D. Conn. 2012) ......... 11, 14, 15

*Heder v. City of Two Rivers*,
    295 F.3d 777 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

*Hunter v. Sprint Corp.*,
    453 F.Supp.2d 44 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*In re Texas EZPawn Fair Labor Standards Act Litigation*,
    633 F.Supp.2d 395 (W.D. Tex. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Kadden v. VisuaLex, LLC*,
    --- F.Supp.2d ----, 2012 WL 4354781, *12 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . 10

*Kessler v. Westchester Cnty. Dep't of Soc. Servs.*,
    461 F.3d 199 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*O'Brien v. Town of Agawam*,
    350 F.3d 279 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Overnight Motor Transportation Co. v. Missel*,
    316 U.S. 572 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,14,19

*Malena v. Victoria's Secret Direct, LLC*,
    --- F.Supp.2d ----, 2012 WL 3542192, *16 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . 25

*Martin v. Tango's Restaurant, Inc.*,
    969 F.2d 1319 (1st Cir. 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mitchell v Abercrombie & Fitch*,
    No C2-04-306, 2005 WL 1159412, at 2 (S.D. Ohio 2005) . . . . . . . . . . . . . . . . . . 20

*Monahan v. Emerald Performance Materials, LLC*,
    705 F. Supp. 2d 1206 (W.D. Wash. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Moon v. Kwon*,
    248 F.Supp.2d 201 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

*Perkins v. Southern New England Telephone Co.*,
    2011 WL 4460248, *2 (D. Conn. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 14, 19

*Ransom v. M. Patel Enters., Inc.,*
    825 F.Supp.2d 799 (W.D. Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

*Rodriguez v. Farm Stores Grocery, Inc.,*
    518 F.3d 1259 (11th Cit. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Russell v. Wells Fargo and Co.,*
    672 F.Supp.2d 1008 (N.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 16

*Seymour v. PPG Industries,*
    09-CV-1707 (W.D. Pa. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Singh v. City of New York,*
    524 F.3d 361 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Skidmore v. Swift & Co.,*
    323 U.S. 134, 65 S.Ct. 161 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,*
    321 U.S. 590, 64 S.Ct. 698 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21, 22

*Trans World Airlines, Inc. v. Thurston,*
    469 U.S. 111 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Truman v. DeWolff, Boberg & Associates, Inc.,*
    2009 WL 2015126, *3 (W.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Urnikis-Negro v. American Family Property Services,*
    616 F.3d 665, 677 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 13, 14, 16

*Valerio v. Putnam Associates Inc.,*
    173 F.3d 35 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Williams v. W.V.A. Transit Co.,*
    472 F.2d 1258 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Yourman v. Dinkins,*
    865 F.Supp. 154 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Yu G. Ke v. Saigon Grill, Inc.*,
    595 F.Supp.2d 240 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

## STATUTES

29 C.F.R. § 516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

29 C.F.R § 778.114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15, 16

29 C.F.R § 778.114(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 17

29 C.F.R § 778.114(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 19

29 C.F.R § 785.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

29 C.F.R § 785.16(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

29 C.F.R § 785.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

29 U.S.C. § 202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

29 U.S.C. § 203(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

29 U.S.C. § 207(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

29 U.S.C. § 213(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

29 U.S.C. § 213(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fair Labor Standards Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

New York State Labor Law § 195 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Jennifer L. O'Neill submits this memorandum of law in opposition to

Defendants' motion for partial summary judgment on her claims for overtime payments pursuant

to the federal and state wage and hour laws. The material facts are set forth in Ms. O'Neill's

Counter-Statement of Material Facts Pursuant to Local Rule 56.1 ("CS Facts") and the Appendix

exhibits, and will only be repeated as necessary.

## PRELIMINARY STATEMENT

Behind every mega-star lies a "personal assistant." In stark contrast to the glamorous life

of the star and the trappings of wealth, the personal assistant is often reduced to performing

grunt-work, acting at the beck and call of the star, and not getting paid much for doing so or, in

some cases, not getting paid at all. This lawsuit illustrates that dichotomy between celebrity and

assistant, between rich and poor, between those who have and those who have not, and, most of

all, between the hubris of a person so enamored with her status that she considers herself above

the law.

By all accounts, Stefani Germanotta, who uses the stage name "Lady Gaga," is a wildly

successful singer and performer. She has achieved near-iconic status, the personification of pop

culture, through savvy marketing strategy and personal drive. CS 85. Describing the demands she

places on herself, Ms. Germanotta told <u>Vogue</u> magazine: "I'm really fucking tired, and I'm at that

last mile of the marathon when your fingers and toes are numb and you can't feel your body and

I'm just going on adrenalin ... ." CS 93.

From February 5, 2010 through her termination on March 5, 2011, Ms. O'Neill worked

for Ms. Germanotta, and for the most part, was her *only* personal assistant. While she was paid to

work an eight-hour day (CS 163), she had no schedule and worked around the clock doing any menial work assignment that her boss required. Without a set schedule, Ms. O'Neill never knew if and when she would suddenly be on call. This situation restricted Ms. O'Neill's personal time, away from the workplace, since she never knew when and under what circumstances she would be required to attend to Ms. Germanotta's many needs. The net result is that Ms. O'Neill worked 168 hours per week for Ms. Germanotta, but was only paid for 40 hours, leaving the majority of her compensation still owed for all of her overtime time work (which was not extraterritorial as per 213 U.S.C. § 213(f) – *see* Dts' Br. at 11, fn. 13).

It is of no moment that Ms. Germanotta believes that Ms. O'Neill did not earn the compensation at issue or believes that Ms. O'Neill is ineligible for overtime – even when she worked 24 hours a day – because she is a salaried employee. Nor does it matter that Ms. Germanotta justified withholding pay from Ms. O'Neill because of the unequal playing field that exists between employer and employee, eloquently articulated by Ms. Germanotta with the following deposition testimony:

> I do six shows a week and I make a lot of money. I work, I work 24 hours a day. I'm not standing next to Steve holding tea, waiting for him to take a sip, that is not what I do. Not that people that do that don't deserve their hourly pay, but I'm just pointing out to you that I deserve everything that I've worked for. I deserve every dollar of it. And she deserves every one of her $75,000 that we agreed to. But she does not deserve a penny more.

CS 192.

What matters is that Ms. Germanotta exploited Ms. O'Neill in direct violation of federal and state statutes. Indeed, the toxic effects of her employment are exactly what the Fair Labor Standards Act ("FLSA") was created to eliminate, i.e., "labor conditions detrimental to the

maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers." 29 U.S.C. § 202.[1] "The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency ... ." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706, 65 S.Ct. 895 (1945). Thus, the FLSA was designed to "upset" the "free market of bargained for wages and length of workweek" in part to "apply financial pressure to spread employment and decrease overtime work." *Adams v. Department of Juvenile Justice of City of New York*, 1996 WL 82404, *2 (S.D.N.Y. 1996).

 As observed by the United States Supreme Court, the sections of the FLSA:

> are remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents <u>to the use and profit of others</u>. Those are the rights that Congress has specially legislated to protect.

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597-98, 64 S.Ct. 698 (1944) (emphasis added).

 By refusing to pay Ms. O'Neill for the actual number of hours she worked, Ms. Germanotta improperly placed her self-serving business interests above Ms. O'Neill's rights in violation of the FLSA and other statutes.[2] In doing so, Ms. Germanotta is now liable for all unpaid overtime wages, liquidated damages, costs and attorneys' fees, and pre-judgment interest. Accordingly, Defendants' motion should be denied in its entirety.

---

[1] It is also significant that Ms. Germanotta does not keep time records of her assistants, in violation of 29 CFR Part 516 and New York Labor Law § 195.

[2] There is no doubt that Ms. Germanotta sees herself as superior to her staff, inasmuch as she described herself and her brand as "queen of the universe every day," and faulted Ms. O'Neill for not "want[ing] to be a slave" to her. CS 84.

### STATEMENT OF FACTS

In February 2010, Ms. O'Neill became Ms. Germanotta's assistant after succeeding another female assistant named Junko. CS 65, 80. While Junko was well received by everyone on the tour, Ms. Germanotta was unhappy with her services because Junko got "tired" (burned out). CS 80, 82.

At the time that Ms. O'Neill was hired, Wendi Morris, the tour manager, believed that Ms. Germanotta needed a second assistant. CS 92. Ms. Morris' described a "good personal assistant" to a star celebrity as someone who "has to be available ... whenever that star needs them." CS 90.

Ms. O'Neill's duties entailed "anything and everything that [Ms. Germanotta] needed ...." O'Neill Dep. CS 95. She was frequently by Ms. Germanotta's side and regularly "in the loop," relating information to Ms. Germanotta in person and conveying Ms. Germanotta's responses back to people via email or telephone. CS 97-99.

Ms. O'Neill worked directly with Ms. Germanotta whenever there was a scheduled performance, whether morning or night, by getting Ms. Germanotta to the venue on time, ensuring she had ample time to have her hair styled and make-up applied, and then getting on stage on time. CS 96, 106. Behind the scenes, Ms. O'Neill participated in the "quick change[s]" between songs. CS 107. Ms. O'Neill had additional duties immediately after each show ended, at the venue and back at Ms. Germanotta's hotel suite. CS 108.

Throughout the day, Ms. O'Neill also set up the hotel room, which required, *inter alia*, unpacking twenty suitcases and accounting for all of the items therein, which was an important task because the suitcases contained all of Ms. Germanotta's essential possessions. CS 100, 147-

50, 152. On departure days, Ms. O'Neill packed the luggage and arranged for it to be transported to a van or bus. CS 111.

Ms. O'Neill's responsibilities extended far beyond the ordinary. She also served as the domestic assistant for the hotel room and the bus, decorated the bus, addressed random emergencies as they arose, accessed Ms. Germanotta's clothes upon request, accounted for Ms. Germanotta's possessions in storage units that she had throughout the world, arranged for the return of items to designers which were loaned to Ms. Germanotta, ran random errands for her, scheduled hair and makeup appointments, scheduled doctor's appointments and coordinated Ms. Germanotta's social plans. CS 102-04, 110, 118, 136, 151-53. Clearly, her job was all-encompassing.

The schedule is grueling, which, at one point, led the tour manager to express concern that Ms. O'Neill was "barely eating." CS 132-33. A "day off" on the tour schedule did not equate to a "day off" between Ms. O'Neill and Ms. Germanotta, i.e., "that she wasn't meant to be working." CS 134. It just meant there was no show that night. CS 134. Even without a show, Ms. O'Neill was still "available" to Ms. Germanotta. CS 136.

In fact, Ms. Germanotta acknowledged that Ms. O'Neill worked on "days off," even though she attributed the extra time worked to Ms. O'Neill's failure to "set [her] up so that [she] could have [her] day off," like purchase her toiletries which she would need that day. CS 137. However, if Ms. O'Neill continued doing work duties during a period when Ms. Germanotta did not need her, Ms. Germanotta would not view that work as "gratis," but rather "cumulative work time, that would have carried over to her next day. ... [B]ecause the days were difficult, I'm sure that if she did something at the end of the day it was to take care of it before the next." CS 138

(emphasis added). Notably, the lists of toiletries and other items which Ms. Germanotta required in, *inter alia*, her dressing room, studio and hotel room were extensive. CS 89.

In reality, Ms. Germanotta never truly takes time off because "[e]very time she leaves an appointment, every time she walks outside, she has to be fully dressed, fully makeup'd, full hair, full everything. Every day is a work day for her ... ." CS 140-41. During the periods listed on the tour calendar as a "vacation," Ms. Germanotta's personal assistant stays with Ms. Germanotta and/or her luggage at a hotel and is expected to be available to respond to her requests at any given moment. CS 54, 152. Indeed, Ms. Germanotta pays for a hotel room for her personal assistant during a "vacation" period to ensure that the assistant is available to Ms. Germanotta as she is still "doing all [of Ms. Germanotta's] assistant work during that time." CS 115-16.

Even when Ms. O'Neill was very ill, she was still expected to – and did – perform functions for Ms. Germanotta. CS 60. In fact, in order for her to receive a month-long break from January 7, 2011 through February 6, 2011, Ms. O'Neill explained to Ms. Germanotta that she had not had any time off all year long, was rundown and could not keep up the pace, and "that most people have three assistants and a stylist doing the work that" Ms. O'Neill was doing. CS 113-14.

Because there was no schedule for Ms. O'Neill, and because Ms. O'Neill was virtually "on call" every minute of every day – whether or not Ms. Germanotta was on tour or on vacation (CS 130-62) and whether or not Ms. O'Neill was completely burned out or ill (60, 114) – she was essentially at work non-stop. Clearly, there were no rules which defined when a setting constituted "work" and when it did not. CS 119-29. Nor was there any understanding between the two that Ms. O'Neill would be compensated for the time she spent on the job. CS 65-69.

## ARGUMENT

## DEFENDANTS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT

**A.**   **Legal Standard**

There exists ample, probative evidence of genuine issues of material fact which bar an

award of partial summary judgment to Defendants on the issues of the fluctuating work week

method of calculating damages, the application of the state Labor Law and whether Ms.

O'Neill's "on-call" time was compensable.

**B.**   **The Fluctuating Workweek Method is Not Applicable**

Defendants' argument in favor of application of the "half time" method of calculating

overtime compensation relies on law which was not designed to formulate damages in a lawsuit,

and ignores specific "prerequisites" which do not exist in this case.

**1.**   **Implementation of a Fluctuating Work Week Method**
   **of Calculating Overtime Compensation**

As a remedial statute, the FLSA sets the standard workweek at 40 hours and requires

employers to pay their non-exempt employees one and one-half times their regular rate of pay for

any hours worked in excess of 40. 29 U.S.C. § 207(a)(1). "Non-exempt employees" are those

who do not work in a "bona fide executive, administrative or professional capacity," 29 U.S.C. §

§ 213(a)(1), even if they receive a salary. Defendants explicitly acknowledge that Ms. O'Neill

was a "non-exempt employee." (Br. at 1, fn. 1.)[3] and thus is entitled to overtime compensation

for any hours she worked which exceeded 40 for that week.

---

[3] Defendants admit that Ms. O'Neill was not an exempt employee. During her deposition, Ms. Germanotta stated: "Jennifer never helped me with anything related to business. She put my socks on my feet and made me tea and brought me my food. She didn't do anything important related to my business." Germanotta Dep. 36: 2-6.

An "interpretive bulletin"[4] promulgated by the U.S. Department of Labor ("DOL") disregards the general method of calculating overtime at time-and-a-half, and results in a significantly reduced payment rate per each hour worked overtime. Set forth in 29 C.F.R. § 778.114, and entitled "[f]ixed salary for fluctuating hours," the bulletin authorizes a method of calculating overtime called the "fluctuating work week method" ("FWW"), which has been described as "an exception to the normal rights of the employee." *Dingwall v. Friedman Fisher Associates, P.C.*, 3 F.Supp.2d 215, 221 (N.D.N.Y. 1998).

"[T]he employer bears the burden of proving that all the requirements for applying the method are present." *Id.* To proceed otherwise would "sanction a compensation scheme expressly proscribed by [§ 778.114]." *Yourman v. Dinkins*, 865 F.Supp. 154, 165 (S.D.N.Y. 1994), *aff'd*, 84 F.3d 655 (2d Cir. 1996), *vacated on other grounds*, 519 U.S. 1145, 117 S.Ct. 1078 (1997).

29 C.F.R. § 778.114(a) provides, *in toto*:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide

---

[4] *See Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268, fn. 5 (11th Cit. 2008) (stressing that § 778.114 is an interpretative bulletin and not a regulation). The difference between a "bulletin" and a regulation is consequential, in that the court is not required to afford it controlling deference as it would a regulation, but rather may use it for guidance, with the "weight" of the agency's "judgment in a particular case ... depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164 (1944)); *see also Perkins v. Southern New England Telephone Co.*, 2011 WL 4460248, *2 (D. Conn. 2011).

compensation to the employee ... for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement. (Emphasis added.)

As indicated by the last sentence of subsection "a," "[t]he possibility of a higher hourly rate in one week [where hours are less than 40] justifies a reduction in overtime compensation if, in future weeks, hours rise above 40." *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002) (emphasis added).

Subsection "b" of the bulletin provides mathematical examples of calculations, and subsection "c" discusses the limitations of the FWW method, including, in relevant part:

Where all the legal prerequisites for use of the "fluctuating workweek" method of overtime payment are present, the Act, in requiring that "not less than" the prescribed premium of 50 percent for overtime hours worked be paid, does not prohibit paying more. On the other hand, where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek overtime formula. (Emphasis added.)

A plain reading of the bulletin reveals that "all the legal prerequisites for use of the 'fluctuating workweek' method of overtime payment" (§ 778.114(c)) include:

(1) an overtime premium is paid to the employee for hours worked greater than forty;

(2) the weekly work hours vary from greater than forty to less than forty; and

(3) a "clear mutual understanding" exists that the employee "will receive a fixed amount as straight-time pay for whatever hours he is called upon to work in a workweek, whether few or many... ." *Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir. 1993) (emphasis

9

added).

Thus, "the rule requires both a 'clear mutual understanding' between the employer and employee

that the fixed wage will constitute the employee's regular or straight-time pay for any and all

hours worked in a given week *and* the separate payment of an overtime premium for any hours in

excess of 40 that are worked in that week." *Urnikis-Negro v. American Family Property*

*Services*, 616 F.3d 665, 677, 682-83 (7th Cir. 2010) (emphasis in original); *see also Kadden v.*

*VisuaLex, LLC*, --- F.Supp.2d ----, 2012 WL 4354781, *12 (S.D.N.Y. 2012) (finding no clear

mutual understanding and thus the FWW method inapplicable given the employer's unilateral

decision not to give the employee overtime compensation as originally promised).

For that reason, recently courts have required the contemporaneous payment of overtime

as an element before finding the FWW method to be applicable. *See e.g. O'Brien v. Town of*

*Agawam*, 350 F.3d 279, 290 (1st Cir. 2003) (declining to apply the FWW method where "neither

the [collective bargaining agreements] nor the Town's methods of calculating pay rates

indicate[d] that the parties reached a clear mutual understanding that the officers would work

varying numbers of hours each week in exchange for a fixed sum."); *Blotzer v. L-3*

*Communications Corp.*, 2012 WL 6086931, *10 (D. Ariz. 2012) (rejecting application of the

FWW method because, *inter alia*, "[t]he parties do not have a 'clear, mutual understanding' that

a fixed salary will be paid for 'fluctuating hours, apart from overtime premiums' because the

parties have not contemplated overtime pay."); *Perkins*, 2011 WL 4460248, *1, *3 (rejecting

retroactive use of the FWW method where the employer – pursuant to a clear agreement – did

not contemporaneously pay plaintiffs an overtime premium of one-half the regular rate for

overtime hours."); *Monahan v. Emerald Performance Materials, LLC*, 705 F. Supp. 2d 1206,

1217-18 (W.D. Wash. 2010); *Ayers v. SGS Control Services, Inc.*, 2007 WL 646326, \*12

(S.D.N.Y. 2007) ("FLSA regulations provide that an employer may not use the [FWW method]

unless each employee receives an 'overtime premium in addition to the fixed weekly salary for

all hours worked in excess of forty (40) during the week.'"); *see also Hunter v. Sprint Corp.*, 453

F.Supp.2d 44, 59 (D.D.C. 2006) (comparing cases to illustrate the disagreement regarding

whether the FWW method of calculating damages requires the contemporaneous payment of

overtime or whether the method may be used to retroactively calculate unpaid overtime for an

employee improperly classified as exempt).

**2.      The Bulletin's Limitations**

The bulletin does not explicitly state whether it applies to "misclassification" cases, i.e.,

when an employee who is entitled to overtime has been mistakenly considered to be "exempt"

from the overtime requirements. In that instance, by deduction, the employee was not paid any

overtime compensation.

Subsection "c" appears to address such a situation, in its discussion of an employee who

has not received payment at a "greater" "rate" for overtime hours, in which case application of

the FWW method is prohibited. Indeed, several courts have found exactly that. *See Hasan v.

GPM Investments, LLC*, --- F.Supp.2d ----, 2012 WL 3725693, *\*3* (D. Conn. 2012) ("The FLSA

mandates that an employee receive a higher rate of compensation for extra hours, and if a

paycheck compensates every hour in a week at a constant rate, then the employer has not

kicked-in a bonus for overtime."); *Blotzer*, 2012 WL 6086931, \*11 (connecting subsection "c" to

how misclassified employees are paid); *Russell v. Wells Fargo and Co.*, 672 F.Supp.2d 1008,

1012 (N.D. Cal. 2009) (classifying this sentence the "contemporaneous payment" requirement);

11

*Hunter v. Sprint Corp.*, 453 F.Supp.2d 44, 59, fn. 16 (D.D.C. 2006).

Some other courts, however, have had difficulty in reconciling the bulletin when considering damages in FLSA overtime cases.[5] One cited reason is that § 778.114(a) "does not supply the proper analytical framework for a determination of damages" in FLSA overtime actions. *Urnikis-Negro* at 681. In *Urnikis-Negro*, the court explained: "Besides looking forward rather than backward, the interpretive rule plainly envisions the employee's contemporaneous receipt of a premium apart from his fixed wage for any overtime work he has performed." As a result, those courts have resorted to a review of *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 580-81, fn. 16 (1942), *superseded on other grounds* by the Portal-to-Portal Act *as stated in Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128, fn. 22 (1985). Yet, 29 C.F.R. § 778.114 is considered to have been promulgated to implement the decision in *Missel*. *See e.g.* *O'Brien*, 350 at 287 n. 15.

In *Missel*, the Supreme Court held that in the absence of any agreement adopting a specific hourly rate for an employee, the regular rate of a salaried employee working hours that fluctuate each week is the fixed weekly wage divided by the number of hours actually worked in that week. The Court considered that the regular rate would vary on a weekly basis, depending on the number of hours actually worked by the employee in any given week. *Id.* at 580. The Court noted in a footnote that "[w]age divided by hours equals regular rate. Time and a half regular rate for hours employed beyond statutory maximum equals compensation for overtime hours." *Id.* at 580, fn.16.

---

[5] It is inaccurate to say that "all Circuit Courts that have addressed this issue support backpay damages at half-time in misclassification cases," as Defendants contend (Br. at 9). *See e.g. O'Brien*, 350 F.3d at 290, *supra*.

Some courts have interpreted the footnote as meaning that the employee has already received "straight time" for the hours worked over forty. *Urnikis-Negro*, 616 F.3d at 675-80, 682-83; *Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1324 (1st Cir. 1992); *see also Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 367 (4th Cir. 2011); *Valerio v. Putnam Associates Inc.*, 173 F.3d 35 (1st Cir. 1999), *citing Martin*. Pursuant to this reasoning, the employee is only entitled to the half-time premium on top of the straight time payment he already received. The result is that those courts have differentiated cases where the salary was intended to cover a "fixed" number of hours, like 40, versus "all time" worked. *See Urnikis-Negro* at 680-81. In the former situation, the employee is entitled to time-and-a-half for overtime work because it was not agreed that the salary was intended to cover work for more than 40 hours per week. In the latter situation, the employee is entitled to the half-time premium, because he/she already received payment for straight time on the overtime hours worked. *See Seymour v. PPG Industries*, 09-CV-1707 (W.D. Pa. 2012).

Contrary to Defendants' assertion and the findings of the cases on which they rely, *Missel* does require the contemporaneous payment of "extra compensation" for hours worked beyond 40 a week in order to comply with the FLSA, as stated in § 778.114(c). In responding to the employer's argument that the hourly pay exceeded the minimum wage, the Court stated:

> It is true that the wage paid was sufficiently large to cover both base pay and fifty per cent additional for the hours actually worked over the statutory maximum without violating [the minimum wage requirement]. But there was no contractual limit upon the hours which petitioner could have required respondent to work for the agreed wage, had he seen fit to do so, and no provision for <u>additional</u> pay in the event the hours worked required <u>minimum compensation greater than the fixed wage</u>. Implication cannot mend a contract so deficient in complying with the law. *Id.*, 581. (Emphasis added.)

Thus, according to the Supreme Court, while an employer and employee could agree to a

compensation arrangement where the employee would be paid a flat amount for fluctuating hours, to comport with the FLSA, not only must the hourly wage satisfy the minimum wage, but the agreement must also include a provision for overtime pay of at least "fifty per cent for the hours actually worked over the statutory maximum." *See also Hasan,* 2012 WL 3725693, *4 (noting that *Missel* requires the contemporaneous extra payment for overtime hours worked); *Perkins,* 2011 WL 4460248, *1 (where the employer did not contend that any contractual limit existed on the number of hours the plaintiffs could have worked, and maintained that plaintiffs were not entitled to any additional compensation, regardless of how many hours they worked, the court stated: "But this is exactly the position rejected in *Missel*."); *Ransom v. M. Patel Enters., Inc.*, 825 F.Supp.2d 799, 806 (W.D. Tex. 2011) ("So while the *Urnikis–Negro* decision is for the most part thorough and careful, it stumbles at the end and too quickly determines that *Missel* answers the question"); *Russell,* at 1011. The courts which have found to the contrary have overlooked the language quoted above. *See e.g. Desmond,* at 357 ([*Missel*] "contains nothing to indicate why [a half-time] computation would not apply in determining unpaid overtime compensation under 29 U.S.C. § 216(b) in a mistaken exemption classification case").

### 3. Applying the FWW Method in an Overtime Misclassification Case Would Eviscerate the FLSA

Courts which have applied the FWW aspects of *Missel* in misclassification cases without requiring all elements – particularly, evidence of the contemporaneous payment of overtime – have come under criticism.  In *Blotzer,* the court observed that "[i]n a misclassification case, at least one of the parties initiated employment with the belief that the employee was exempt from the FLSA, paid on a salary basis, and therefore not entitled to overtime" and "because the

14

employees were erroneously classified as exempt, overtime compensation was not provided contemporaneously." *Id* at \*10; *see also Hasen,* 2012 WL 3725693, \*4 ("parties who believe that an employee merits no overtime payment cannot simultaneously believe that any overtime will be paid at varying rates"); *Ransom*, 825 F.Supp.2d at 810, fn. 11 ("The significance of the employee's lack of knowledge of non-exempt status cannot be overstated. ... The employee, if he raised the issue, will have been told that the salary is all he will receive, regardless of how many hours he works. ... When it turns out that the employer is wrong, and it is learned that the FLSA required the employer to pay the employee an overtime premium, the notion that the employee's conduct before he knew this is evidence that the employee somehow consented to a calculation method for the overtime pay that no one even knew was due, is perverse."); *In re Texas EZPawn Fair Labor Standards Act Litigation*, 633 F.Supp.2d 395, 402 (W.D. Tex. 2008) (attempting to retroactively apply the FWW method to a miscalculation case is akin to "the old 'square peg in a round hole' problem [because it requires] apply[ing] § 778.114 to a situation it was not intended to address").

Courts have also considered the practical consequences of applying the FWW method to misclassification cases:

> [A]n employer could claim exempt status for an employee, withhold overtime, then after being held liable for failing to pay overtime, escape the time and one-half requirement of the FLSA. ... Certainly nothing about allowing this would eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202.

*EZPawn*, at 404-05; *see also Hasan* at \*4 ("misclassified employees will never have received any kind of bonus or premium for overtime. Indeed, parties will have explicitly agreed, as they did in this case, that employees will not earn extra money for long hours"); *Blotzer* at 11 ("[a]pplication

of the FWW in a misclassification case gives rise to a 'perverse incentive' for employers, because the employee's hourly 'regular rate' decreases with each additional hour worked."); *Russell* at 1014 ("Given the remedial purpose of the FLSA, it would be incongruous to allow employees, who have been illegally deprived of overtime pay, to be shortchanged further by an employer who opts for the discount accommodation intended for a different situation").

Insofar as the *Urnikis-Negro* court observed that the bulletin "does not supply the proper analytical framework for a determination of damages" in FLSA overtime actions, *Id.*, at 681, the *EZPawn* court reconciled that view with the inapplicability of the FWW to misclassification cases by explaining that the bulletin is not a regulation, was adopted for a wholly different purpose, and use of it as a damage methodology is inconsistent with the FLSA and its stated purposes. *Id.* at 405–06. Since *EZPawn* was decided.  Courts have recently trended to the same conclusion: that 29 C.F.R. § 778.114 only applies to prospective agreements between employers and employees, and not to retrospective damage calculations. *See Ransom*, at 803.[6]

The DOL Letter, "FLSA2009-3," dated Jan. 14, 2009, on which Defendants rely (Gershengorn Decl. Ex. 1), has likewise been criticized on the ground that it relied on cases that did not apply the method in a misclassification context or that provided no analysis. *See Blotzer*, 2012 WL 6086931, *9, fn. 9; *Russell*, 672 F. Supp. 2d at 1013-14 (also finding the letter to be contrary to the background and policy of the FLSA). The state DOL on which Defendants rely is flawed for the same reason.

---

[6] The *Ransom* court also cited several cases which found that that *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135 (5th Cir.1988), on which Defendants rely (Br. at 14), was wrongly decided but nevertheless felt bound to follow it. *Id.*, 803.

**4.**    **The FWW Method is Inapplicable in This Case**

Applying the foregoing principles, Defendants' argument in favor of the FWW method is completely erroneous.  Ms. O'Neill never received the "extra compensation" required by 29 C.F.R. § 778.114(a) for those weeks in which she worked more than forty hours. Indeed, Ms. Germanotta described such overtime payments as an "[im]possibility" and emphatically declared that none of her employees are entitled to overtime. CS 70.  As she explained, "[i]f a day off becomes a day on, that doesn't mean she can charge me overtime.  It's a salary." CS 74.

On the one occasion when Ms. O'Neill opined to Ms. Germanotta that she should receive overtime because the tour was extended by several days, ultimately she was denied any overtime pay. CS 33. Accordingly, it is undisputed that the required element of "extra compensation" is missing, thus rendering the FWW method inapplicable.

Also missing is the "clear mutual understanding" about how overtime hours would be calculated and compensated. No one ever spoke with Ms. O'Neill about overtime or even her compensation when she was hired to work for Ms. Germanotta in February 2010. CS 30, 65. No one ever considered whether Ms. O'Neill was eligible for overtime compensation. CS 67-70.  On that issue, Ms. Germanotta told Mr. Carter, "work out something with [Ms. O'Neill] that is appropriate to what [her] other assistants have had, and that should just be her flat fee for the year." CS 73. That loose arrangement, however, does not constitute the requisite "clear mutual understanding" of the FWW method.

Further, insofar as Ms. Germanotta insisted that "[Ms. O'Neill] absolutely never worked over a 9:00 to 5:00 job" (CS 163), then in Defendants' view, Ms. O'Neill's salary was simply

intended to compensate for forty hours of work per week.[7]  At the very least, then Ms.

Germanotta's statement negates any inference that there was a "clear mutual understanding"

about a fluctuation in weekly hours which would sometimes exceed forty and sometimes be less.

Defendants' failure to demonstrate as a matter of law that Ms. O'Neill ever had a <u>short</u>

week from which the long weeks fluctuated is also fatal to their reliance on an FWW calculation.

Of course, the fact that Ms. Germanotta failed to maintain time records, in violation of 29 C.F.R.

§ 516 and Labor Law § 195, render it impossible for her to disprove that there were short weeks.

In any event, the 2010 "per diem" sheets which Defendants produced reveal that Ms. O'Neill

worked seven days a week. CS 167. Thus, there was no shortfall of time from which the long

weeks varied. *See Heder*, 295 F.3d at 780 (rejecting FWW method of calculating overtime

where, *inter alia*, "[t]here is no shortfall of time (and correspondingly higher hourly rate) in one

pay period that might make up for longer work in another").

While Defendants point to testimony which they contend indicates that Ms. O'Neill was

not "working" for a few random hours (Br. at 16), Defendants are not able to rebut the evidence

that Ms. O'Neill either worked or was on-call seven days a week, especially given the absence of

time records. Thus, even if on one or two days in an occasional week Ms. O'Neill took a few

hours off, such as for her birthday party (Br. at 16), there is ample evidence that she still worked

---

[7]  Ms. Germanotta further believes that Ms. O'Neill "didn't earn" the extra compensation
at issue – not because of the hours which Ms. O'Neill worked, but because "[Ms. O'Neill] was
completely ... desperate for money, for a job," "had been unemployed for some time," "the job
was essentially a favor" and "she agreed to the compensation." CS 75, 77. Ms. Germanotta added
that Ms. O'Neill "knew exactly what she was getting herself into, and she knew there was no
overtime," "[s]he knew what the job entailed ..." and "[t]his whole case is bullshit." CS 76. Ms.
Germanotta called Ms. O'Neill "a fucking hood rat" for bringing this lawsuit. CS 79.

more than forty hours that week.

That some days may have been lighter than others would not create a "windfall" to Ms. O'Neill if the time-and-a-half method is applied, as Defendants urge (Br. at 16-17, 18-19), since Ms. O'Neill was never credited with the overtime which she did work. To the contrary, "assessing damages using the fluctuating workweek method provides a perverse incentive to employers to misclassify workers as exempt, and a <u>windfall</u> in damages <u>to an employer</u> who has been found liable for misclassifying employees under the FLSA." *Perkins*, *4, fn. 5 (emphasis added).

Regardless of whether the salary was meant to compensate for forty hours of work per week or for "all time" worked, it is clear from Ms. Germanotta's testimony that Ms. O'Neill was paid "straight time" for all hours worked, including those weeks in which she worked over 40 hours. That arrangement does not comply with the requirements of the bulletin or *Missel*. 29 C.F.R. § 778.114(c). Consequently, Defendants are not entitled to partial summary judgment in favor of using the FWW method. Indeed, as shown above, the FWW method is inapplicable as a matter of law.

**C.**   **The New York State Labor Law Governs Ms. O'Neill's State Law Claims**

Ms. O'Neill is entitled to overtime pay under the New York State Labor Law for hours she worked outside of New York, since New York is Ms. O'Neill's domicile and her work throughout the country involved only temporary assignments.

As Defendants point out, the governing jurisprudence indicates that the state Labor Law is applicable to persons employed or "laboring" in the State of New York. *See e.g. Hart v. Dresdner Kleinwort Wasserstein Sec., LLC*, 2006 WL 2356157 (S.D.N.Y. 2006). Yet, an

employee does not lose her status of being employed in New York merely because she is assigned albeit for brief and isolated periods to a location outside the State. *See Truman v. DeWolff, Boberg & Associates, Inc.*, 2009 WL 2015126, *3 (W.D. Pa. 2009) ("although there is an applicable FLSA exemption, we cannot find an implied foreign work exemption in the PMWA to remove coverage from Pennsylvania residents who have been given assignments outside of Pennsylvania."); *Mitchell v Abercrombie & Fitch*, No C2-04-306, 2005 WL 1159412, at 2, 4 (S.D. Ohio 2005) ("[t]here is no claim that [plaintiff] ever worked for even a brief period of time in Ohio, which would change the analysis as to the applicability of Ohio law to his employment relationship."); *Williams v. W.V.A. Transit Co.*, 472 F.2d 1258 (D.C. Cir. 1972) (concluding it was not the legislative intent to deprive an employee of his status of being employed in the District "merely because he receives an assignment, for a relatively short period, that calls on him to spend all his time for that period at some location outside the District."). To find to the contrary would require employees to invoke the statute of each state in which they worked while they were on temporary assignments, no matter how brief those assignments might be, leading to litigation in multiple forums.

The cases on which Defendants rely are readily distinguishable in that they involved employees who were transferred to a foreign office and complained of acts which occurred following the transfer. *See Hart; Hammell v. Banque Paribas*, 90-cv-4799, 1993 WL 426844 (S.D.N.Y. 1993). Here, New York is Ms. O'Neill's domicile, as evidenced by her driver's license and statement that New York is her "hometown" where she stayed when Ms. Germanotta was not on tour. CS 12, 197-200.

To the extent Defendants rely on testimony which they contend refutes Ms. O'Neill's

residence in New York (Br. at 20), the testimony raises an issue of fact. *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006). With that, Defendants are not entitled to summary judgment on their Labor Law issue and their argument that the New York Labor Law does not apply should be rejected outright.

**D.**   **Ms. O'Neill's "On Call" Time is Compensable as a Matter of Law**

Defendants fail to demonstrate their entitlement to partial summary judgment on the issue of whether Ms. O'Neill's "on call" time was compensable.

Whether the term is "on-call," "on-duty" or "working time," for it to be compensable pursuant to the FLSA, an employee's on-call hours must be spent predominately for the employer's benefit. *See Armour & Co. v. Wantock*, 323 U.S. 126, 133, 65 S.Ct. 165 (1944). The compensable "work" need not be not limited to "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business' (italics supplied)." *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 598, 64 S.Ct. 698. "Readiness to serve may be hired, quite as much as service itself ... ." *Armour v. Wantock*, 323 U.S. at 133; *Singh v. City of New York*, 524 F.3d 361, 367 (2d Cir. 2008).

"An employee who is required to remain on call on the employer's premises <u>or so close thereto</u> that he cannot use the time effectively for his own purposes is working "on call." 29 C.F.R. § 785.17 (emphasis added). Thus, "an employer must pay his employees for waiting time between tasks if the employees are expected to be ready whenever performance is required,." 29 U.S.C. § 203(g); *see, e.g., Yu G. Ke v. Saigon Grill, Inc.*, 595 F.Supp.2d 240, 255-56 (S.D.N.Y. 2008); *Moon v. Kwon*, 248 F.Supp.2d 201, 229 (S.D.N.Y. 2002). To avoid liability the employer

must "definitely [tell the employee] in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived." 29 C.F.R. § 785.16(a).

Further, "[w]hether the time [during which an employee can leave the job] is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case." *Id.* "[W]hen periods of inactivity are 'unpredictable ... [and] usually of short duration,' and the employee 'is unable to use the time effectively for his own purposes,' then the employee is 'engaged to wait,' and the inactive time constitutes 'work' time under FLSA-even if 'the employee is allowed to leave the premises or the job site during such periods of inactivity.'" *Moon,* at 229, *quoting* 29 C.F.R. § 785.15. Because the FLSA's provisions "are remedial and humanitarian in purpose," the statute "must not be interpreted or applied in a narrow, grudging manner." *Tennessee Coal, Iron & R.R. Co.,* 321 U.S. at 597.

Defendants cannot demonstrate as a matter of law that at all times throughout the thirteen-month period at issue, Ms. Germanotta told Ms. O'Neill that she could leave her job and return by a specific time, and that the time allotted was long enough for Ms. O'Neill to use the time effectively for her own purposes. The record reflects the contrary conclusion, that Ms. O'Neill, Ms. Germanotta's *only* personal assistant during most of the time at issue, was expected to be available as needed throughout each hour of each day of the week, i.e., "24/7." CS 54, 164-65. During the tour particularly, Ms. O'Neill slept in the same bed as Ms. Germanotta, and felt that she was required to do so because unlike everyone else, Ms. O'Neill was not given her own hotel room. CS 175-77.

To be "available" meant much more than simply answer the phone; it meant that Ms. O'Neill had to stop what she was doing and perform the requested functions. CS 38, 47, 49, 52-

54, 59, 130-40, 144-65. When there was no immediate task requiring attention, Ms. Germanotta's personal assistant "wasn't held captive, but if she was needed, she would – she should be <u>there</u>, yes." CS 37 (emphasis added). Ms. Germanotta expressed that she would be "upset" if Ms. O'Neill went too far to be able to respond to a need. CS 38.

Even if "there were <u>many times</u>" when Ms. Germanotta would advise Ms. O'Neill that she would not need her for a time certain (CS 171 [emphasis added]), it stands to reason that there were also <u>many times</u> when Ms. Germanotta did not advise her of same, and she remained waiting for her next task. Further, even if Ms. Germanotta gave Ms. O'Neill some hours off, they were not guaranteed, whether due to an aborted boat trip, or Ms. Germanotta's need for someone to help her at 3:00 a.m. because she was "hanging over the toilet vomiting" and "wouldn't know how to call a doctor." CS 172, 181-82.

Those limited occasions during which Ms. O'Neill could arguably "leave the job" were not long enough for her to use the time effectively for her own purposes. CS 53. Ms. O'Neill was tethered to Ms. Germanotta and described her limited free time this way: "[i]t was - you could squeeze in whatever you felt you could accomplish at that time." CS 38. "So I never felt that I could just frolic about in any city that I was [in] as long as I had my phone and, you know, oh she calls, I can just go back. I was always doing something for her." CS 53. These frequent demands render otherwise non-compensable on-call or break time fully compensable. *See, e.g., Moon*, at 230 (plaintiff's waiting time during evening was different than that during night, since his work during evenings was more frequent, and periods of inactivity during evenings were shorter, making it far more difficult for him to " 'to use the time effectively for his own purposes' ") (quoting 29 C.F.R. § 785.15).

Whether or not Ms. O'Neill could "go do as she pleases," as Defendants contend (CS 53), does not warrant a different conclusion. *Armour*, 323 U.S. at 133 ("Certainly [the employer and employee] were competent to agree, expressly or by implication, that an employee could resort to amusements provided by the employer without a violation of his agreement or a departure from his duty.")

Indeed, the one occasion that Ms. O'Neill expressed to Ms. Germanotta that she was "tired" and needed adequate rest became the "catalyst" for Ms. O'Neill's termination. CS 184-86. While Ms. Germanotta testified that "you could obviously tell that [Ms. O'Neill] was tired" (CS 187), she also formed the opinion that Ms. O'Neill "wasn't doing anything the day before" which warranted the "perk" of adequate rest. CS 188-90. Ms. Germanotta terminated Ms. O'Neill because: "No one has ever demanded of me that they will be upset with me and throw me attitude because I don't provide them with a special section of the plane for them to sleep." CS 189-90. Ironically, Ms. Germanotta recognized that if her security detail (who are not directly employed by Defendants) did not receive their 10 to 12-hour breaks, "they would get sick and they would not be able to do their jobs." CS 83.

In any event, Ms. Germanotta's personal assistant is generally expected to be immediately available to Ms. Germanotta and thus worked uninterrupted, extended shifts from the time that she first "reports" to work until her "shift" ends. *See, e.g., Yu G. Ke, supra* at 256. When the assistant can no longer keep up the momentum, i.e., when she becomes "tired" like Junko and Ms. O'Neill, Ms. Germanotta is no longer interested in working with her and she loses her job.

Despite geographic and transportation constraints due to the nature of Ms. Germanotta's business, the law contemplates that arrangements be made to create a schedule and keep time

24

records for those periods constituting a "work day." For now, Defendants are not entitled to partial summary judgment on Ms. O'Neill's claim that her "on call" work was compensable.

**E.      Ms. O'Neill's Spread of Hours Claim is Withdrawn**

Defendants acknowledge that there has been a split within the Second Circuit as to whether New York's "spread of hours" regulation applies to all employees, regardless of whether they earn more than the minimum wage. *See* Br. at 24, fn. 21. That said, in view of the recent case of *Malena v. Victoria's Secret Direct, LLC*, --- F.Supp.2d ----, 2012 WL 3542192, *16 (S.D.N.Y. 2012), involving a woman whose salary was $75,000 per year, it does appear that the trend within this District has been to reject the regulation's applicability to those who make greater than minimum wage. Accordingly, Ms. O'Neill will stipulate to withdraw her third cause of action pursuant to the "spread of hours" regulation.

## CONCLUSION

For all of the foregoing reasons, it is respectfully requested that with the exception of their last argument on the "spread of hours" regulation, this Court deny Defendants' motion in its entirety, and grant such other and further relief as it deems proper.

Dated: January 14, 2012
      New York, New York

                                Respectfully submitted,

                                SNITOW KANFER
                                & HOLTZER, LLP

                By:                                
                                Virginia K. Trunkes
                                575 Lexington Avenue
                                New York, New York 10022
                                (212) 317-8500
                                *Counsel for Plaintiff Jennifer O'Neill*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JENNIFER L. O'NEILL,                            :

                  Plaintiff,     :

       -against-                                :

MERMAID TOURING INC. AND                       :
STEFANI JOANNE GERMANOTTA,
a/k/a "LADY GAGA,"                              :

              Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No. 11-Civ-9128 (PGG)

ECF

**CERTIFICATE
OF SERVICE**

        VIRGINIA K. TRUNKES  hereby certifies that on January 14, 2013deponent

caused a true copy of the within Plaintiff's Memorandum of Law in Opposition to Defendants'

Motion for Partial Summary Judgment, Appendix I and Appendix II, to be served by hand to the

following counsel:

        PROSKAUER ROSE, LLP
        Steven D. Hurd
        Brian J. Gershengorn
        Rachel Fischer
        Eleven Times Square
        New York, New York 10036
        (212) 969-3000
        *Attorneys for Defendants*

                                      VIRGINIA K. TRUNKES